UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENE BROWN, KENNETH EDWARDS, ALAN HANDELL, ROBERT HEISS, CAROLINE JAISARIE, KRISTIN LEU, KEVIN O'SULLIVAN, JUAN PAZMINO, HARRY PRECOURT AND ROSALIND WILSON,

    Plaintiffs,

-against-

PHILIP J. CALDARELLA,

    Defendant.

Case No. 08-CV-0857

**PHILLIPS DECLARATION**

1. I am an attorney admitted to practice before this Court and an associate of Orrick, Herrington & Sutcliffe LLP, counsel to Plaintiffs in this matter.

2. I make this Declaration upon personal knowledge for the purpose of placing before the Court the attached document in support of Plaintiffs' Order to Show Cause for a Preliminary Injunction.

3. Attached as Exhibit A hereto is a true and correct copy of Plaintiffs' Answer in the arbitration filed by Defendant before the American Arbitration Association, Case No. 13-460-02030-07.

4. No previous application for this relief has been made. [handwritten]

I declare under penalty of perjury that the foregoing is true and correct.

January 24, 2008

            _____
            RENEE B. PHILLIPS

OHS East:160372399.1

# EXHIBIT A



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 FIFTH AVENUE
NEW YORK, NY 10103-0001

tel +1-212-506-5000
fax +1-212-506-5151

WWW.ORRICK.COM

December 3, 2007

Renee B. Phillips
212-506-5153
rphillips@orrick.com

**VIA FACSIMILE AND FIRST CLASS MAIL**

Patricia M. Fisk
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

Re: *Philip J. Caldarella v. Binding Together Inc., et al.*, AAA Case No. 13-460-02030-07

Dear Ms. Fisk:

We represent Respondents Binding Together, Inc. ("BTI"), and Board of Director members Gene Brown, Kenneth Edwards, Alan Handell, Robert Heiss, Caroline Jaisarie, Kristin Leu, Jocelyn Newkirk, Kevin O'Sullivan, Juan Pazmino, Harry Precourt and Rosalind Wilson in the above-referenced matter. The following is submitted in reply to the Amended Statement of Claim filed by Claimant Philip Caldarella ("Claimant") dated November 14, 2007. As set forth more fully below, there is absolutely no basis for Claimant's claim that he is entitled to any compensation or damages in connection with the termination of his employment as Executive Director of BTI effective June 1, 2007. Rather, BTI's Board of Directors approved the termination of Claimant's employment for "cause" based on his continued neglect of his duties, misconduct, and mismanagement, all of which led BTI into a state of severe financial distress and possible dissolution. Accordingly, except as is expressly admitted below, Respondents deny each and every one of the material allegations in the Statement of Claim.

**I.     BACKGROUND**

Binding Together, Inc. is a not-for-profit, 501(c)(3) organization. It was established in 1987 with the purpose of providing job training and employment services to formerly homeless New York City men and women in recovery from substance abuse. Binding Together has provided its trainees with marketable job skills combined with life coping tools in an effort to deter recidivism. The mission of Binding Together is to train, educate, and empower individuals with disabilities and multiple barriers to employment including the homeless, ex-offenders, the unemployed and underemployed, by providing vocational training and employment opportunities.

After twenty years of serving the New York community, BTI will likely be closing its doors in 2008. The Board of Directors voted in October 2007 to dissolve the organization based on the determination that BTI will be unable to climb out of the massive debt incurred under the continued neglect of Claimant as its Executive Director.


ORRICK

Patricia M. Fisk
December 3, 2007
Page 2

### A. Claimant's Responsibilities as Executive Director of BTI

Claimant was Executive Director of Binding Together from approximately the time the organization was founded until his termination, effective June 1, 2007. Claimant's employment was governed by an employment contract, the most recent of which was executed on March 18, 2004 and was to run through June 30, 2010. (See Exhibit A.) That contract defined Claimant's duties as Executive Director as follows:

> Caldarella is engaged to serve as Executive Director and shall be responsible to, and report to the Trustees of the Corporation.[1] His responsibilities shall include maximizing enrollment of trainees and **management of BTI's income and expenses to assure BTI's continued success.** Caldarella shall have **general supervision over personnel** of the Corporation relevant to the performance of his responsibilities. At all times Caldarella is subject to the supervision of the Trustees and shall **devote all of his exclusive business time and best efforts, skills and abilities** to the performance of his responsibilities.

(Emphasis added.) The contract further provided that "The Corporation may elect to terminate this Agreement for cause if it shall determine, in good faith, that there has been continued neglect by Caldarella of his duties hereunder or willful misconduct on his part in connection with the performance of such duties."

### B. Claimant's Mismanagement, Misconduct, and Neglect of Duties

Over the years, BTI experienced periods of relative stability and occasionally had other periods that were more difficult financially, such as after the September 11, 2001 terrorist attacks. The organization seemed always able to bounce back after difficult times, and the Board was generally confident in Claimant's ability to lead the organization.

Beginning in or about 2005, however, this began to change, and by Spring, 2007, the Board had lost all confidence in Claimant's ability to lead BTI. Claimant's tenure at BTI had become characterized by imprudent decisionmaking, lack of knowledge of basic facts about the organization he was tasked to run, lack of supervision of BTI personnel, and other misconduct and mismanagement. The following are just some of the examples of Claimant's mismanagement, neglect, and misconduct:

---

[1] "Trustees of the Corporation" refers to the Board of Directors and the two terms are used interchangeably.

OHS East:160333820.1
910098-52 RBP/RBP


ORRICK

Patricia M. Fisk
December 3, 2007
Page 3

1. **Financial Results**

BTI experienced significant yearly declines in net assets (a not-for-profit accounting term similar to "net worth") beginning in Fiscal Year ("FY") 2005.[2] The organization reported a surplus (a not-for-profit accounting term similar to "net earnings") in FY2004 of $4,010 and ended the year with net assets of $699,800. BTI then reported a 32% decline in revenue over the next two years and a large deficit (a not-for-profit accounting term similar to "net loss") in each of them, $421,738 in total. BTI ended FY2006 with net assets of $278,062. BTI's unaudited statements for FY2007 (subject to audit) report another 29% decline in revenue to $1,917,810 and a deficit of $750,601, resulting in <u>deficit</u> net assets of $472,539.

BTI borrowed money from a bank to supplement operating cash flow. BTI repaid $150,000 of bank debt in FY2005, reducing the balance to zero. Interest-bearing debt was $61,009 on June 30, 2006, despite the fact that cash on hand totaled $191,251. The unaudited June 30, 2007 balance sheet lists cash of $32,298 and bank debt of $182,662. The lender declined further advances in May, 2007.

2. **Financial Recordkeeping**

BTI's financial records under Claimant's tenure were unreliable and incomplete. In the Spring of 2007, BTI's Board of Directors engaged a firm of independent accounting consultants, The Finance Department, to reconstruct BTI's financial books and records for the entire 2007 fiscal year in order to prepare for the required annual audit. By the time the books were ready for audit, this engagement had resulted in approximately $80,000 of expense.

The Finance Department uncovered irregularities in BTI's financial records that occurred in FY2007 and earlier in Mr. Caldarella's tenure (although The Finance Department was only engaged to examine FY 2007). They include:

**Cash:** BTI did not keep track of its cash balance. BTI has 11 bank accounts but only 2 had been reconciled as of June 2007 (they had virtually no transactions). The primary account had not been reconciled with the general ledger since June 2005, and the balance had significant monthly variances with bank statements. Some checks were printed and signed but then held indefinitely, commingled with other papers in various locations, including a staff member's desk drawer; there was no record of which checks were being held or of their locations. Payroll amounts were recorded in total instead of individually, making it impossible to reconcile that account, and adjustments to it often were incorrect. Other transactions were not recorded.

---

[2] BTI operates on a July 1 to June 30 fiscal year.

OHS East:160333820.1
910098-52 RBP/RBP


ORRICK

Patricia M. Fisk
December 3, 2007
Page 4

**Tax Returns**: Despite BTI's precarious financial condition, BTI's FY2005 return was not filed until June 2006, resulting in IRS penalties and late fees of $14,893. The FY2006 return was signed on April 15, 2007, but appears not to have been filed timely nor an extension requested. BTI has received notices of $17,400 in penalties for its 2006 return. As a not-for-profit organization, BTI generally would not have owed the IRS any money as long as the returns were filed on time or an extension requested, making the neglect to file particularly egregious.

In addition, the tax returns for The Preferred Images, Inc., a 501(c)(3) not-for-profit created by BTI for purposes of performing certain contracts, was also filed late for FY2005, resulting in penalties and late fees of $18,441. Nor was the Preferred Images return for FY2006 filed on time.

**1099s**: For calendar year 2006, BTI did not prepare 1099s for ten contractors who should have received them. The omissions include 1099s for the part-time CFO/Controller, Yuri Klarvit; the Director of Sales and Marketing's direct employer, Relationship Link, LLC; and BTI's auditor, Paul Rafanello, CPA, PLLC. BTI staff informed The Finance Department that Mr. Klarvit had instructed the office manager not to issue 1099s for 2006 to himself and the Director of Sales and Marketing. As a result, it would appear that these individuals did not pay required income taxes, leaving BTI at risk for possible penalties.

**W-2's**: Claimant did not include the personal use of his company-leased vehicle on his W-2 form in 2006. In addition, holiday bonuses for all staff, including Claimant, were paid through accounts payable instead of through BTI's payroll service, and as a result were not reported on employees' W-2s in 2006. As a result, both BTI and its employees, including Claimant, did not pay taxes on these amounts, leaving BTI at risk for additional possible penalties.

3.  **Additional Neglect of Management Duties/Misconduct**

Claimant delegated financial management to the CFO and Controller, and business development to the Director of Sales and Marketing, but he supervised their work ineffectively and himself engaged in misconduct. For example:

- BTI's external auditor resigned shortly before presenting the FY2005 draft financial statements to BTI's Board because the auditor learned that BTI's CFO, who reported to Claimant, had been signing other signatories' names on BTI checks. Claimant was reluctant to terminate the CFO's employment for cause on the basis of this information (he was ultimately convinced to do so), and Claimant admitted that he, too, signed other signatories' names on BTI checks. Upon learning that Claimant had signed other signatories' names on


ORRICK

Patricia M. Fisk
December 3, 2007
Page 5

      checks in addition to the CFO, BTI's auditor refused to sign off on the organization's financial statements and resigned.

- Despite the obvious irregularities in BTIs financial recordkeeping, Claimant signed off on BTI's tax returns, declaring under penalty of perjury that they were true, correct, and complete to the best of his knowledge. Claimant knew, or at the very least should have known, that he could not make such representations because under his leadership, BTI's accounting records were unreliable and incomplete. At best, this was gross negligence; at worst, willful misconduct.

- During FY2005 and FY2006, a staff member repeatedly ordered printer toner significantly in excess of BTI's production requirements; the excess orders totaled approximately $70,000. This toner has never been accounted for. The absence of proper oversight and security procedures allowed this activity to continue for months.

- BTI's leading salesman, who had accounted for about half of BTI's sales volume, resigned in FY2007. Many BTI clients moved their accounts with him. Shortly after his departure, it became clear that BTI had virtually no records of his business development activities and client contacts. BTI made no effort to recover the lost clients until early FY2008.

      As stated above, these are only some of the examples of Claimant's mismanagement, negligence and misconduct as Executive Director of BTI. Respondents will present additional evidence of Claimant's poor judgment and misuse of company assets and property at the hearing in this matter.

### C. Claimant's Abandonment of His Post and Termination

      BTI's Board of Directors knew that BTI was having some financial difficulty in 2006 and 2007, but were under the impression that it was of a similar magnitude to what the organization had weathered in the past. Then, on April 24, 2007, during a regularly scheduled Board meeting at which Claimant was present, an outside consulting firm presented the Board with the shocking news that BTI would likely be out of cash by September, and that it would be a significant challenge to maintain operations through the end of December.[3] Board members were completely taken aback and extremely concerned at the news and did not understand why they were not informed of the gravity of the situation before it reached such a critical state. Had Claimant not been negligent in

---

[3] Meanwhile, in April, 2007, Claimant had commenced on BTI's behalf a thirty-nine month lease for a 2007 Nissan Murano with payments of $448.15 per month, which SUV was paid for in its entirety by BTI despite being almost entirely for Claimant's own personal use.


ORRICK

Patricia M. Fisk
December 3, 2007
Page 6

his contractual duties to "manage BTI's income and expenses," surely the organization would not have reached such a state of emergency where it appeared unlikely that it would be able to survive.

Adding insult to injury, Claimant announced upon the conclusion of the meeting that he would be leaving on a three-week vacation to Hawaii. One of the Board members, Gene Brown, asked Claimant how he could leave at such a critical time when BTI needed his help the most. Claimant responded in essence "If you don't like it, you can fire me." The Board members were in absolute shock at this response, and particularly at the nonchalance with which Claimant expressed it. It was clear that, upon breaking the news that BTI was in a state of complete financial disaster, Claimant was abandoning the organization without any apparent misgivings, and the Board would have to pick up the pieces left in his wake.[4]

While Claimant was on vacation in Hawaii, the Board members, and particularly the members of the Executive Committee, worked to get BTI's finances in order and to try to secure a merger partner that could possibly save the organization. The Board also considered how to deal with the clear lack of leadership at the top of BTI, and determined that Claimant should be removed from his position. The Board decided that Claimant should be asked to resign. Bob Heiss, Chairman of the Board of BTI, called Claimant to ask him to resign, and Claimant agreed to do so. During that conversation and in the weeks that followed, Claimant did not mention anything to Mr. Heiss about any alleged entitlement to payments under his employment contract.[5]

Claimant later changed his position and indicated that his departure should not be considered a resignation, and demanded his full salary until June 2010 based on his interpretation of his employment contract. Board members explained to Claimant and his counsel over the weeks that followed that BTI could not afford to pay Claimant's six-figure salary as severance when BTI barely had enough cash available to pay its most basic expenses, and to do so would force the organization into dissolution.[6]

---

[4] Prior to the meeting, Claimant met with Harry Precourt, a financial consultant to non-profits, who had been recommended for Board membership but was not yet a Board member. Claimant informed Mr. Precourt that BTI was in a worse financial state than ever before and Claimant did not see how the organization could possibly survive. He then stated that he would be leaving on vacation after the meeting, and that he knew he should not be going, but he was going to go anyway.

[5] Claimant did, however, ask Mr. Heiss for proof that he was no longer employed so that he could forward this information to the financial aid office at his daughter's college. If Claimant believed that his resignation entitled him to full salary through June, 2010, presumably there would have been no need to forward this information.

[6] To put Claimant's disputed severance payments at a higher priority than the overall solvency of BTI and BTI's other creditors would have constituted a clear breach of fiduciary duty. Moreover, had the Board paid

OHS East:160333820.1
910098-52 RBP/RBP


ORRICK

Patricia M. Fisk
December 3, 2007
Page 7

Subsequent efforts by Board members to negotiate an amicable resolution with Claimant were unsuccessful. Accordingly, in light of the fact that Claimant's departure could no longer be considered a resignation, and as cause existed for Claimant's termination, as defined by the employment agreement, the Board voted in August 2007 to clarify that Claimant's termination was for "cause." Under the express terms of the employment agreement, Claimant was not entitled to continued salary in the event of a termination for cause.

As Claimant's employment was terminated for cause, his claims of entitlement to additional compensation are meritless, and Claimant's Statement of Claim must therefore be dismissed.

## II. ADDITIONAL DEFENSES AND AFFIRMATIVE DEFENSES

In addition to Respondents' defenses described above, Respondents assert the following additional defenses and affirmative defenses:

1. The Statement of Claim fails to state a claim upon which relief may be granted.

2. The AAA does not have jurisdiction over the individual Respondents.

3. The individual Respondents are immune from liability under Section 720-a of the New York Not-for-Profit Law.

4. The individual Respondents did not act with "gross negligence" or an "intent to injure" Claimant.

5. Neither Claimant nor the severance payments in dispute are covered by the New York Labor Law.

6. Section 198 of the New York Labor Law does not create a private right of action.

7. There is no basis for an award of attorneys' fees or liquidated damages in this action.

8. Claimant's claims are barred by the doctrines of unclean hands, waiver, and/or estoppel.

9. Claimant's breaches of fiduciary duty negate any claim for relief.

---

Claimant severance despite owing hundreds of thousands of dollars to the IRS and its secured and unsecured creditors, such payments would have forced BTI into dissolution and arguably would have been viewed as impermissible preference payments under the Bankruptcy Code.

OHS East:160333820.1
910098-52 RBP/RBP


ORRICK

Patricia M. Fisk
December 3, 2007
Page 8

10. Any losses, damages, or other injury allegedly suffered by Claimant arising in or out of Claimant's employment with BTI were caused by Claimant's own actions, negligence or failure to act.

11. Claimant has failed to diligently mitigate his damages, if any, and is therefore barred from receiving all or part of the relief requested in the Statement of Claim.

12. Respondent reserves the right to assert further affirmative defenses and to amend its answer upon the discovery of facts not presently known.

### III.  CONCLUSION

Claimant's claim for compensation, damages, and attorneys' fees are without factual or legal basis. Accordingly, Respondents seek an award dismissing Claimant's Amended Statement of Claim.

Very truly yours,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Respondents

By: _____
Renee B. Phillips

cc: Ronald I. Paltrowitz, Esq., via facsimile and first class mail

# EXHIBIT A

# EMPLOYMENT AGREEMENT

AGREEMENT made this 18th day of March 2004 by and between The Trustees of Binding Together Incorporated, a corporation having its principal place of business at 200 Hudson Street, 10th Floor, New York, New York 10013 (hereafter "BTI" or the "Corporation") and Philip J. Caldarella, an individual and Executive Director of the Corporation, residing at 555 Adirondack Court, Mahwah, NJ 07430 (hereafter "Caldarella").

## WITNESSETH:

**WHEREAS**, Caldarella has been employed by the Corporation since July 1987 and has devoted his best and full efforts to the Corporation's development and success since the inception of his employment by the Corporation; and

**WHEREAS**, Caldarella desires to secure his position in the Corporation with due regard for the fact that it is a Not-for-Profit Corporation; and

**WHEREAS**, the Trustees also desire to protect the Corporation's best interests by obligating Caldarella for a term of years under an employment agreement.

**WHEREAS**, Caldarella and the Trustees previously entered into an agreement that by its terms expires June 30, 2004 and now desire to continue their mutually beneficial relationship by entering into a new agreement.

**NOW, THEREFORE**, the parties hereto, intending to be bound, agree as follows:

### 1. Employment

The Corporation hereby employs Caldarella and Caldarella hereby accepts employment upon the terms and conditions hereinafter set forth.

### 2. Term

Caldarella's term of employment hereunder shall be for 6 years, commencing from July 1, 2004, and ending on June 30, 2010, subject however, to the right of either party to terminate his employment as hereinafter provided. Unless earlier terminated, the parties hereto shall discuss a renewal or extension of the term of employment commencing no later than 90 days prior to the expiration of this Agreement. Nothing herein contained shall be deemed to obligate the parties hereto to renew or extend this Agreement.

### 3. Duties and Title

Caldarella is engaged to serve as Executive Director and shall be responsible to, and report to the Trustees of the Corporation. His responsibilities shall include maximizing enrollment of trainees and management of BTI's income and expenses to assure BTI's continued success. Caldarella shall have general supervision over personnel of the Corporation relevant to the performance of his responsibilities. At all times Caldarella is subject to the supervision of the Trustees and shall devote all of

his exclusive business time and best efforts, skills and abilities to the performance of his responsibilities.

**4. Remuneration**

a) Effective from July 1, 2004, with the first year of this Agreement, the Corporation shall pay Caldarella a base salary in the amount of $152,218 per year.

b) Effective July 1, 2005, the Corporation shall increase the base salary by five (5%) percent to $159,829. Effective July 1, 2006, the Corporation shall increase the base salary by five (5%) percent to $167,820. Effective July 1, 2007, the Corporation shall increase the base salary by five (5%) percent to $176,211. Effective July 1, 2008, the Corporation shall increase the base salary by five (5%) percent to $185,022. Effective July 1, 2009, the Corporation shall increase the base salary by five (5%) percent to $194,273.

c) The Corporation, in its discretion, will provide Caldarella with a bonus each year, which will reflect the Corporation's performance under Caldarella's management. The amount of the bonus will be determined by the Executive Director Incentive Plan, which will be revised annually to reflect performance expectations for that year.

**5. Expenses**

The Corporation will reimburse Caldarella on a monthly basis for all business related expenses incurred by him in the course of the performance of his duties, upon the presentation of appropriate vouchers, receipts, etc.

**6. Fringe Benefits**

a) The Corporation shall provide Caldarella with benefits that are no less than any other employee receives under the benefit programs of the Corporation.

b) The Corporation shall provide Caldarella with a vehicle in order for him to carry out his duties and responsibilities as the Corporation's Executive Director. The Corporation shall be responsible for the maintenance and upkeep of the vehicle.

c) Nothing in this article shall be construed to mean that the Corporation may not extend benefits to Caldarella which are greater than those extended to the Corporation's employees generally.

**7. Vacation**

Caldarella shall be entitled to five (5) weeks of paid vacation (i.e., 25 business days) during each calendar year of the term of this Agreement, to be governed by the Corporation's Employee Handbook/Policy Manual.

### 8. Disability

After exhausting his sick days entitlement for the calendar year, in the event Caldarella shall be unable to perform his normal duties and responsibilities in any period of up to one (1) month by reason of illness or incapacity, his compensation and benefits shall remain intact.

### 9. Termination With Cause

The Corporation may elect to terminate this Agreement for cause if it shall determine, in good faith, that there has been continued neglect by Caldarella of his duties hereunder or willful misconduct on his part in connection with the performance of such duties. Upon such termination, all obligations of the Corporation hereunder shall forthwith cease and come to an end. If Caldarella disputes such termination, then all of the Corporation's obligations hereunder shall continue until there is a final ruling on the merits of their dispute as provided for in paragraph 12 of this Agreement.

### 10. Restrictive Covenant

During the term of this Agreement, Caldarella shall not, for his own account or as a partner, director, stockholder, officer or employee of any other corporation, partnership, sole-proprietorship, or business entity engage in any business competitive with the business of the Corporation, and he shall give his best efforts on a full time basis to promote the best interest of the Corporation. Further, Caldarella shall keep confidential during the term of this Agreement, all information which may be revealed or available to him in the course of his employment, including without limitation, information relating to the BTI's needs and requirements regarding any actual and potential sources of enrollees, job placement facilities or other areas of critical business concerns, when such disclosures may be in any way prejudicial to the interests of the BTI, except to the extent that such disclosure may be necessary or appropriate to the effective and efficient discharge of his duties to the Corporation. Caldarella agrees that in the event he resigns from further employment by the Corporation during the term of this agreement or at the expiration thereof, he will not directly or indirectly compete with the Corporation by forming or joining another competitive entity within one (1) year of such resignation. He further agrees to notify the Corporation of his intention to resign 90 days prior to the effective termination date.

### 11. Death During Employment

BTI shall provide Caldarella with term life insurance coverage so that if he should die during the term of this Agreement, his estate shall receive two (2) years of his base salary compensation, in accordance with the Corporation's Employee Handbook/Policy Manual.

### 12. Arbitration

Any controversy arising out of or relating to this Agreement or the alleged breach thereof, shall be settled by final and binding arbitration in New York City at the American Arbitration Association, the costs of which shall be borne equally by the parties. In the event the dispute concerns termination with cause, the Corporation may request expedited arbitration (a hearing within seven (7) days); the arbitrator shall be

required to complete the hearing in one (1) day, and issue a ruling within 7 days of the hearing. Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction.

### 13. Notices

Any notice required or permitted to be given by either party to the other shall be deemed sufficiently given when in writing and sent by certified or registered mail, return receipt requested, addressed to the other as set forth at the head of this Agreement or at such other address of which notice shall have similarly been given. Nothing contained in this paragraph shall be deemed to require such notice with respect to routine communications between the parties in the performance of this Agreement.

### 14. Successors

In the event that the Corporation is merged, or becomes affiliated, this Agreement shall remain binding on the Corporation's successor, or the new entity, and Caldarella. In such an event, all rights, duties, benefits, and responsibilities of this Agreement will be deemed transferred to the Corporation's Successor or new entity.

### 15. Severance Benefit

In the event that during the term of this agreement the Corporation closes down and/or dissolves, or is sold or merged, or relocates, and any of the foregoing happenings results in the cessation of Caldarella's employment, then the Corporation will provide him with severance pay for 12 months of salary. In the event that Caldarella's employment is not renewed/extended, and he is thereafter terminated, he shall also be entitled to the severance pay provision of this paragraph.

### 16. Whole Agreement

This document contains the entire Agreement between the parties and may not be changed orally and no amendment thereof shall be valid or binding unless the same is made in writing and signed by each of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this __15th__ day of March 2004.

**Binding Together Incorporated**

By: _____

**Philip J. Caldarella**

_____